**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1424-23

KGNJ OPERATIONS, LLC,

     Plaintiff-Appellant,

v.

BOROUGH OF KEYPORT and
BLAZE KEYPORT, LLC,

     Defendants-Respondents,

and

GARDEN STATE
MARIJUANA, LLC,

     Defendant.

_____

Argued February 27, 2025 – Decided March 18, 2025

Before Judges Natali, Walcott-Henderson, and Vinci.

On appeal from the Superior Court of New Jersey, Law Division, Monmouth County, Docket No. L-2997-22.

Joshua S. Bachner argued the cause for appellant (Mandelbaum Barrett, PC, attorneys; Joshua S.

Bauchner, Andrew Gimigliano, and Marlene M. Arabia, of counsel and on the briefs).

Ted Del Guercio, III, argued the cause for respondent Borough of Keyport (McManimon, Scotland & Baumann, LLC, attorneys; Leslie G. London and Ted Del Guercio, III, of counsel and on the brief).

Timothy J. Bloh argued the cause for respondent Blaze Keyport, LLC (Fox Rothschild, LLP, attorneys; Timothy J. Bloh and Jacqueline A. Davis, on the brief).

PER CURIAM

In this prerogative writs action, plaintiff KGNJ Operations LLC (KGNJ) appeals from a December 12, 2023 order affirming defendant Borough of Keyport's (Borough) grant of a resolution in support of defendant Blaze Keyport LLC's (Blaze) application for a cannabis retail license.[1]  KGNJ argues the Borough's grant of the resolution in support of Blaze was arbitrary, capricious, and unreasonable.  Discerning no error in the court's decision to uphold the Borough's resolution in support of Blaze's application, we affirm.

I.

At issue in this case is the Borough's decision to grant a resolution in support of Blaze's application for a cannabis retail license under the New Jersey

---

[1] Defendant Garden State Marijuana, LLC (Garden State) did not participate in this appeal.

Cannabis Regulatory, Enforcement Assistance, and Marketplace Modernization Act (CREAMMA), N.J.S.A. 24:6I-31 to -56. The relevant facts are substantially undisputed.

On November 9, 2021, the Borough adopted Ordinance #15-21 (the Ordinance) "to allow for the operation of a limited number of cannabis businesses subject to certain conditions." The Ordinance provides the Borough would issue a maximum of two Class 5 cannabis retailer licenses (CRL). Keyport, N.J., Ordinance 15-21 (Nov. 9, 2021). The Ordinance also provides for a cannabis subcommittee, consisting of two members of the Borough Council (Council) and the Borough's Chief of Police. The subcommittee is responsible for reviewing all applications for cannabis licenses and submitting a recommendation to the Borough for final action.

Within months of the effective date of the Ordinance, the Borough issued a request to the public for submission of applications for resolutions of support with respect to licensure in the highway commercial district. The first page of the application provided instructions to applicants, stating "[a]pplications must be completed and include all required documents. Legal documents included as part of this [a]pplication must be properly signed and executed." The application also detailed the evaluation process to be undertaken by the Borough, which

3

provided:

> After submission to the Borough Clerk, completed [a]pplications will be sent to the Keyport Police Department for background check processing. Following review and approval by the Keyport Police Department, the [a]pplication will be sent to the [subcommittee], established in accordance with [the Ordinance], for review and recommendation to the Borough's governing body as to whether the license should be granted or denied. The [subcommittee's] review will also include an interview with the [a]pplicant.
>
> Following a review of the [a]pplication and interview by the [subcommittee], the [a]pplicant will be invited to attend the next scheduled public meeting of the [Council] to make a presentation to [the Council] and the public and to respond to questions raised. After the public hearing, the [subcommittee] will make a recommendation to the Borough's governing body at the next scheduled public meeting regarding the [a]pplicant. The award of a municipal cannabis business license will be made contingent upon the [a]pplicant receiving a State license and all applicable State and local requirements.
>
> [Emphasis omitted.]

The application also requested information regarding on-site parking, whether the applicant owned the premises, security in and around the location, whether the applicant planned to hire local residents as employees, the plan for providing benefits to employees, applicant's commitment to diversity, and any sustainability plans.

4

The Borough attorney, with input from subcommittee members, prepared and published an evaluation sheet to guide the subcommittee's review. The evaluation sheet provides "[t]he [subcommittee] will review and evaluate each [a]pplicant based on the following criteria in making its recommendation to the [Council]," and that each of the nine criteria could be awarded ten points. The criteria included:

[1] Applicant's owners' or principals' qualifications and experience operating in highly regulated industries, including cannabis, healthcare, pharmaceutical manufacturing, and retail pharmacies . . . .

[2] Results of [a]pplicant's background check . . . .

[3] Applicant's written commitment to employ Borough residents in at least [fifty percent] of full-time equivalent positions.

[4] Applicant's ties to the Borough . . . .

[5] Applicant's proposal to provide community benefits in the Borough.

[6] Applicant's demonstrated commitment to diversity in its ownership composition and hiring practices.

[7] Public input regarding [a]pplicant's proposed cannabis facility in the Borough.

[8] Applicant's financial capability to open and operate the cannabis establishment for which the [a]pplicant is seeking a permit.

[9] Applicant's completed [a]pplication for a [CRL] including all required documents. . . .

[Emphasis omitted.]

The Borough received three applications seeking resolutions of support from KGNJ, Blaze, and Garden State. All three applicants were interviewed by the subcommittee. It is undisputed the only completed evaluation sheet awarded KGNJ a perfect score. No other subcommittee members completed the evaluation sheet as to any of the other applicants.

Following the subcommittee's review, the Borough considered the subcommittee's recommendation and each application. The following notes were taken during the Borough's executive session:

> Discussion was had as to pros and cons—consensus i[n] location is a big consideration. [The] Council reviewed Google street view of each location and surrounding areas on the screen in [C]ouncil chambers. Concerns were expressed regarding Garden State location impact to adjacent residential area, no direct highway access; and traffic safety concerns were expressed as to the location of [plaintiff], specifically visibility issue near curve and no shoulder area.
>
> CM Mcnamara expressed support of Blaze, feels it is the best location. CM Araneo expressed support of [plaintiff], feels partial local ownership is a benefit. He is nearby if needed. CM Pacheco was inclined to agree with CM Araneo but said she was swayed during discussion of location. CM Peperoni said he was concerned that there is no shoulder in front of

6

[plaintiff's] location and is worried about the traffic coming up a blind curve. CM Davidson said she is concerned with the flow of traffic into the parking lot of the proposed location of [plaintiff] and agreed with CM Peperoni regarding no shoulder being dangerous for traffic flow. She said the location of Garden State would potentially force traffic through residential areas.

General discussion was had regarding limiting hours of operation with trial period—reservations only.

General consensus is for support of the submission of an application by Blaze for a [C]lass 5 cannabis license in the highway district.

At the same meeting, the Council voted five-to-one to issue a resolution of support to Blaze. The resolution provided:

[B]ased on its thorough and comprehensive review and evaluation of all of the applications, together with the interviews conducted by the [s]ubcommittee with each applicant and the presentations made by each applicant and public comments made at a Borough Special Public Meeting, the [subcommittee] has determined that the proposed cannabis business location of [Blaze] is appropriately located and is suitable for activities related to the operations of the proposed retail cannabis business in the Borough and therefore, recommends that the Borough [governing body] support the application of [Blaze] for a Class 5 [CRL] for the [h]ighway [c]ommercial [d]istrict from the Commission . . . .

Following the Borough's grant of the resolution of support in favor of Blaze, in an October 6, 2022 letter to the Borough, KGNJ stated "[w]hile the

7

Borough published evaluation criteria, no scores were provided by the [subcommittee] and, therefore, KGNJ is unable to ascertain the evidential basis on which the [Borough] made its decision."  KGNJ "demand[ed] that detailed scoresheets for KGNJ, Blaze, and all other applicants for a resolution of support in connection with a Class 5 [CRL] be provided."

The Borough responded in writing, stating "the evaluation sheets you have identified were provided and intended to be used solely as guidance documents" for the subcommittee's review.  The Borough confirmed only one subcommittee member had used the evaluation sheet and only to evaluate KGNJ but confirmed the other subcommittee members "followed the evaluation criteria set forth . . . and discussed same orally during [s]ubcommittee meetings."

On October 28, 2022, KGNJ filed a complaint in lieu of prerogative writs seeking emergent injunctive relief from the Borough's grant of the resolution of support in favor of Blaze.  KGNJ alleged the Borough's decision to award the resolution to Blaze was arbitrary, capricious, and unreasonable, the Borough failed to apply their own objective criteria, and the result was the issuance of a biased and subjective resolution.  The court denied KGNJ's application for emergent injunctive relief in a December 7, 2022 order and held a bench trial on April 6, 2023.

A-1424-23

At the conclusion of trial, the court issued a written opinion and order affirming the Borough's resolution of support in favor of Blaze's application. The court found CREAMMA "contains no requirements as to what should be considered by a local public entity with reference to applications for a resolution of support issued by the local governing body." "The statute contains no restrictions as to the factors that a local governing body may consider in adopting such a resolution, and also contains no requirements concerning factors that a local entity must consider in adopting a resolution of support."

The court explained under CREAMMA applications for a Class 5 CRL must include "'proof of local support for the suitability of the location,' which is one aspect of an application by a proposed cannabis retailer that can be considered." The court concluded "the Borough engaged in a detailed process to decide . . . which applicant should be granted a resolution of support. . . . The Borough's review process and the resolution of support adopted by the Borough do not violate any requirement of [CREAMMA]."

The court, referencing the "voluminous documents provided by the parties as exhibits," concluded the subcommittee and the Borough "engaged in a long, thoughtful process leading to the award of the resolution of support to Blaze." The court also noted "[t]he considerations referenced in the evaluation sheet

9

addressed the same information as was provided by the applicants to the cannabis subcommittee and thereafter in a presentation to the full Borough Council." The court concluded, "KGNJ has provided no support to the court indicating that members of the subcommittee or the Borough Council . . . were required to fill out a particular form in performing a review of the applicants."

Addressing KGNJ's contention Blaze's application made part of the record was unsigned, the court explained "[t]here is no obligation under any statute or administrative code provision requiring an applicant to a local governing body to submit a signed application for a resolution of support." The court further stated, "[t]he application for the issuance of a resolution of support is not analogous to a public bidding process and is not governed by public bidding law." The court explained the Borough determined the lack of a signature did not void Blaze's application and concluded it "cannot determine that the Borough's determination is incorrect as a matter of law." This appeal followed.

II.

Interpretation of a statute is a question of law that is reviewed de novo. McGovern v. Rutgers, 211 N.J. 94, 108 (2014). A court's duty is to "construe and apply the statute as enacted." DiProspero v. Penn, 183 N.J. 477, 492 (2005). "The Legislature's intent is the paramount goal when interpreting a statute and,

generally, the best indicator of that intent is the statutory language." Ibid. (citing Frugis v. Bracigliano, 177 N.J. 250, 280 (2003)). Words contained within the statute should be given their plain meaning and we "read . . . in context with related provisions so as to give sense to the legislation as a whole." Ibid.; see also N.J.S.A. 1:1-1 (explaining a statute is to be given its plain meaning, "unless inconsistent with the manifest intent of the [L]egislature or unless another or different meaning is expressly indicated"). "We will not presume that the Legislature intended a result different from what is indicated by the plain language or add a qualification to a statute that the Legislature chose to omit." Tumpson v. Farina, 218 N.J. 450, 467-68 (2014) (citing DiProspero, 183 N.J. at 493).

CREAMMA empowers the State Cannabis Regulatory Commission with "all powers necessary or proper" to execute its duties, including:

> (1) To regulate the purchase, sale, cultivation, production, manufacturing, transportation, and delivery of cannabis or cannabis items . . .
>
> (2) To grant, refuse, suspend, revoke, cancel, or take actions otherwise limiting licenses or conditional licenses for the sale . . . of cannabis items, or other licenses in regard to cannabis items, and to permit, in the [C]ommission's discretion, the transfer of a license between persons . . . .

[N.J.S.A. 24:6I-34(b)(1) to (2).]

CREAMMA provides a business intending to sell cannabis must obtain a CRL issued by the Commission to operate a premises where cannabis is sold. N.J.S.A. 24:6I-42. CREAMMA's corresponding regulatory framework, N.J.A.C. 17:30-1.1 to -8.3, sets forth the documentation a prospective business must submit to the Commission in their application, including proof of zoning approval and "local support." N.J.A.C. 17:30-7.10(b)(7) to (9). "Proof of local support" is embodied in a municipal governing body's resolution. Big Smoke LLC v. Twp. of W. Milford, 478 N.J. Super. 203, 219 (App. Div. 2024).

Relevant to this appeal, CREAMMA empowers municipalities to regulate cannabis establishments within their border. Ibid. Provided they are "not in conflict with the provisions of CREAMMA, municipalities may adopt ordinances or regulations":

> (1) governing the number of cannabis establishments, distributors, or delivery services, as well as the location, manner, and times of operation of establishments and distributors, but the time of operation of delivery services shall be subject only to regulation by the commission; and
>
> (2) establishing civil penalties for violation of an ordinance or regulation governing the number of cannabis establishments, distributors, or delivery services that may operate in such municipality, or their location, manner, or the times of operations.

[Ibid. (quoting N.J.S.A. 24:6I-45(a)).]

"[M]unicipalities are delegated the authority to promulgate location and density requirements for cannabis retail businesses and are statutorily vested with the right to decline approval for applicants who fail to meet those requirements." Id. at 220.

Here, the Borough adopted the Ordinance to set forth requirements for cannabis businesses in Keyport, which provides:

> All licenses required . . . including renewal licenses, shall be issued by the governing body of the Borough, which shall also administer the provisions of this Chapter. The granting of any license permitted by this Chapter shall be at the sole and absolute discretion of the governing body of the Borough.
>
> [Keyport, N.J., Ordinance 15-21 (Nov. 9, 2021).]

Also relevant to this appeal, the Ordinance created the subcommittee, consisting of two members of the Borough Council, the Chief of Police, and the Borough business administrator, "which shall review all completed submissions for any [c]annabis license and submit a recommendation to the entire governing body regarding the grant or denial of a license." Ibid.

On appeal, KGNJ argues the Borough's failure to use the evaluation sheet after publishing it on their website is arbitrary, capricious, and unreasonable. KGNJ also contends "it is apparent that the different members of the

13

[s]ubcommittee applied different criteria and methodologies to reach their conclusions." Additionally, KGNJ asserts the subcommittee did not evaluate "the strengths or weaknesses of the applications based on the same criteria and may not have relied on the criteria set forth in the [e]valuation [s]heet," arguing "[t]hat error is magnified by the total absence of identifiable criteria being applied to Blaze's application."

Finally, KGNJ argues "it is even more important for this [c]ourt to ensure that when a municipality adopts a process, the municipality follows the process it adopted. Otherwise, municipalities would be free to set standards and public expectations 'to ensure transparency,' and then deviate from them for any reason." In making this argument, KGNJ cites In Re Application for Medicinal Marijuana Alternative Treatment Center for Pangea Health & Wellness, LLC, 465 N.J. Super. 343 (App. Div. 2020).

We reject KGNJ's arguments and affirm substantially for the reasons expressed in the court's thoughtful and well-reasoned decision. We provide the following comments to amplify our decision.

As a preliminary matter, KGNJ's argument the Borough erred in considering Blaze's unsigned application is unavailing given there is no legal requirement an application for a cannabis license be signed. We note the

14

Borough's business license application required "[a]ll legal documents included as part of this [a]pplication must be properly signed and executed." Nevertheless, because there is no such requirement in law, we discern that any failure on the part of the Borough to ensure Blaze's application was in fact signed is, at best, harmless error. See Willner v. Vertical Realty, Inc., 235 N.J. 65, 79 (2018). The fact it was unsigned did not affect the outcome because the court clearly reviewed the entire application. As the court articulated, the Borough did not notice Blaze's application was unsigned, and the application for the issuance of a resolution of support from a municipality is not analogous to the application for a retail dispensary license made to the State pursuant to CREAMMA. The Borough elected to consider Blaze's application, and there is no basis in the law to disturb its consideration of the unsigned application.

In rejecting KGNJ's remaining arguments, we are not convinced that Pangea applies. 465 N.J. Super. at 343. In Pangea, appellants challenged the Department of Health's (DOH) selection process used to license alternative treatment centers designed to "grow, process, and dispense marijuana as part of the State's Medicinal Marijuana Program." Id. at 355. There, the DOH selected a six-member committee to review and score all applications. Id. at 359. The committee was comprised of four representatives from the DOH, one from the

Department of Agriculture, and one from the Department of the Treasury. Ibid. Each member of the committee was provided with printed scoring instructions for sixty criteria and given six weeks to complete their review before the scores of each member were "averaged to produce the applicant's final score on each criterion." Id. at 363. The scores awarded varied greatly amongst committee members—for instance, Pangea received both perfect scores and zeros. Id. at 371.

The DOH issued a four-page decision, "[a]ccepting those score without further apparent scrutiny, and without allowing disappointed applicants any means to question or challenge their scores or the scores of those that were approved." Id. at 361. We noted the DOH's decision did not explain "whether or to what extent the [DOH] may have reviewed or verified the scores rendered by the review committee." Ibid. We therefore vacated and remanded the court's decision, agreeing the scoring system used "produced arbitrary results that have gone unexplained." Ibid.

The facts in Pangea are distinguishable from those before us in one critical aspect: the review committee in Pangea was required to use an evaluation sheet to score each application and submit their scores within six weeks. Here, neither CREAMMA, nor the Ordinance require the use of the evaluation sheet in the

16                                                                 A-1424-23

same manner. As the court explained, there is no support in the record for KGNJ's contention members of the subcommittee or the Borough were required to complete the evaluation sheet as part of the application process. Significantly, the evaluation sheet contained criteria that mirrored the application requirements for a resolution of support and was employed as a guideline or tool for subcommittee members. It did not contain separate or additional criteria.

As Blaze notes, the evaluation sheet "does nothing more than repeat the information required to be produced as part of the [a]pplication." For instance, the evaluation sheet requested, "[a]pplicant's written commitment to employ Borough residents in at least [fifty percent] of full-time equivalent positions." At the same time, the application requests the applicants "[d]escribe the [a]pplicant's plans to hire local residents as employees in the proposed facility." Given its intended use as a guiding tool, it is of no consequence all members of the subcommittee did not complete and score the evaluation sheet, in the context of the Borough's overall determination, so long as they considered the same criteria.

Significantly, the Borough's decision was "based on its thorough and comprehensive review and evaluation of all of the applications, together with the interviews conducted by the [s]ubcommittee with each applicant and the

17

presentations made by each applicant and public comments made at a Borough Special Public Meeting." Accordingly, based on our de novo review, the court did not err in affirming the Borough's grant of the resolution in support of Blaze's application.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

*M.C. Harley*

Clerk of the Appellate Division

18